Govt VI v. Lettsome Good morning, my name is Nimesha Boykin, and I am here on behalf of the appellant Ranael Lettsome. May I reserve two minutes for rebuttal? Thank you. We're here today to discuss the numerous errors that occurred below. What was the single most significant error? Well, the two Sixth Amendment violations. I'm sorry, say that again? The two Sixth Amendment violations. And I know that you asked for the single, but I think each is just as egregious as the other. We'd also like to discuss the trial court's denial of the motion for continuance, the allowance of the amendment of the information on the morning of jury selection, the excessiveness of the sentences, as well as the sufficiency of the evidence for count 11. Now, the Sixth Amendment violations in this case were particularly egregious because they were the result of prosecutorial misconduct. The record is completely clear that Ms. Taylor was, in fact, as important to the events that led up to the unfortunate death of Mr. Geiger in the attack on his son, as was Mr. Lettsome. What efforts did defense counsel at the trial make to subpoena Ms. Taylor? The defendants did place Ms. Taylor on our witness list. They did serve her with a trial subpoena. Did they try to serve her with a trial subpoena? They tried to serve her with a trial subpoena. The marshal went out to search for her. The subpoena was returned unexecuted. And by the time of trial, Detective Phipps actually testified that the government had no knowledge as to her whereabouts. The prosecutor had actually had Ms. Taylor and her children removed from the jurisdiction and sent to Florida. So it was only the prosecutor who had unique knowledge of where Ms. Taylor was and how to locate her. This is complete prosecutorial misconduct. Is there anything unusual about her going to Florida as opposed to anywhere else? No, Your Honor. The issue isn't where she went to. The issue is the fact that she was removed from this jurisdiction and not returned to testify at trial when her testimony was, in fact, used at trial. Now, the trial court and defense apparently blow her into the mistaken impression that there was no means to return her to the jurisdiction. And on the second day of trial in passing, the prosecutor mentioned that, OK, a material witness affidavit could have been available. But those were, you know, that was less than 10 or 20 words out of three days of trial. Prior to that, the government's position was that they had no duty to return her to the jurisdiction. They had no duty to produce her at trial. Is it incumbent on defense counsel to know how to secure a witness? It is not, Your Honor. Defense counsel made all efforts to secure the witness. But Melendez-Diaz clearly teaches us that it's the duty of the government to produce the witnesses against the defendant. No, no, no. Not exculpatory witnesses. The government has a duty to present witnesses to support their case, but the government is under no obligation to present defense witnesses. That's correct, Your Honor. The exculpatory witnesses, Mr. Letson has a right to have compulsory process to obtain them. Shouldn't the lawyer have been aware of the protocol to secure the appearance of Ms. Taylor? I mean, shouldn't the lawyer know that? Well, Your Honor, the lawyer did have a subpoena issue to try and secure her attendance. He wasn't aware of how to secure her presence while she was in Florida, correct? Correct, Your Honor. The judge didn't even know. Correct, and that's the problem, Your Honor. The judicial system is composed the way it is so that these types of errors don't happen. Even if the lawyer is under mistaken belief, the trial judge should have known that, yes, I have the power to do this. But the trial judge is the person who really solidified this error by saying repeatedly over all three days of trial, I do not have the authority to compel Ms. Taylor to appear at trial. Is it harmless, a prejudicial error, but harmless given your client's two separate confessions of the crime, confessions which involve knowledge that had not been made public? And coupled with the DNA errors. Your Honor, I'll take those questions in turn. It was not harmless, and the problem with that is that these types of errors are, in fact, structural, and they mandate vacater. That's what the Supreme Court has been leaning towards, and that's what it teaches, particularly Gonzalez-Lopez, when the court analogized the right to counsel of choice to this particular right to have compulsory process. But Ms. Taylor was not a witness necessarily in favor of your client. Why was it a structural error? Well, it's our position, Your Honor, that Ms. Taylor would have been a witness in favor of our client had she been compelled to appear in the courtroom and testify. What evidence do you have to support that statement? Well, Your Honor, we have, in fact, the – well, first of all, Your Honor, this court has precedent that says when a party has unique access to a witness – You just said that she would have been offered favorable testimony. Yes. What would she have said, and how do you know that? Your Honor, we believe that Ms. Taylor would have said that her second statement to the police was a fabrication. And what supports that in the record is the fact that the first time she appeared to the police to make a statement, she just denied any knowledge and involvement at all. The statement to the police that Letsom is the one who committed the crime? No, the statement before that, where she just said, I don't have any involvement, I don't know who stole the money, I don't know what happened surrounding Mr. Geiger's death. Is that relevant to the crime for which Letsom was convicted? She knows nothing. Correct. That's relevant, Your Honor, because it contradicts her second statement, where she goes and she implicates two other people besides herself. And in doing so, when she made that second statement, she informed Detective Phipps that she and Letsom had, in fact, discussed these issues when she, subsequent to the events, Your Honor. Back to Judge Osorio's point that his DNA was found at the scene of the crime. Yes, Your Honor, and the appellate division, for some reason, characterized that as overwhelming evidence. The evidence was not so overwhelming, and that's a problem with another one of the issues, because, yes, there was some DNA evidence. There were fingerprints outside. His DNA was found on a water bottle, but not all of the evidence rose to the level of scientific certainty. And having only two weeks to retain an expert and have that expert analyze the DNA evidence, the defendant was deprived of the opportunity to properly rebut that evidence. You say you only had two weeks to retain an expert. You knew the DNA was available for it, not you, but defense knew that the DNA was out there for months, and they made no effort until very late in the day to secure an expert. Isn't that fair? No. We knew that the DNA evidence was going to be tested for months. However, the report was only received by Letsom two weeks before trial. So you knew there was some DNA testing going on. Yes. At that point, is it incumbent on defense counsel to retain an expert? Yes, Your Honor, but even if you retain an expert, I think it's highly unfair to say that that expert would be able to analyze the DNA data, create a report, have that report returned and distributed, and appear to testify at trial within two weeks. I'm not suggesting you do it within two weeks. I'm suggesting you, being the defense, retain an expert as soon as they know that there's DNA evidence, not wait until you get the government's report. Even if the expert had been retained, when was the expert going to be able to analyze the results? That wouldn't have been possible until the two weeks right before the trial. That wouldn't be sufficient. We did not have the specific items that were analyzed. The only thing that we were able to obtain are the results of the government's DNA analysis. Let me back up to Ms. Taylor's statement. What do you make of the way that the trial court and defense counsel and the prosecutor presented Ms. Taylor's narrative to the jury? I think that compounded the error, Your Honor. Once Ms. Taylor was not presented at trial and once Mr. Lessin did not have the opportunity to compel her appearance, no state agreed to this protocol, right? This is what the judge offered as a suggestion of rectifying the error where, in fact, the trial judge compounded the error. That's why there were appellate courts to reverse. The appellate division, recognizing the existence of Crawford, should have reversed. Instead, the appellate division explicitly said that it was not going to follow Crawford. There's no basis for that in law. Instead, the appellate division decided to follow Van Arsdale. Now, the error of the trial court is made even more egregious by depriving Mr. Lessin of his Sixth Amendment rights not once but twice. There's absolutely no basis for what the trial court did, Your Honors. None whatsoever. Let me recap one of your points. What is the testimony that you wanted from Taylor, Amber Taylor? That was not presented in the narrative that was read to the jury. The testimony that was not presented that we would have liked to have, Your Honor, is that her second statement was a fabrication, that it was not true, and that she, in fact... Second statement implicating your client? Correct, Your Honor. Do you have a basis for that statement? I mean, had somebody spoken to her? It's just a speculation as to what she might have said. Your Honor, this is what my client's belief is. And, of course, we have the right to present this to the jury. You know, they have a longstanding relationship. The testimony is unrefutable that Mr. Lessin and Ms. Taylor cared for each other. Mr. Lessin was very protective of her. And, frankly, just looking at her statements alone, you can see that her statements throughout are very inconsistent. So there's no basis to believe anything that she said in the second statement any more than there's a basis to believe anything else that she said. Actually, couldn't her absence help you? Because it certainly gave you the opportunity to question the government's actions, removing her, for example, a critical witness to the offense, removing her from the jurisdiction, preventing her live testimony. The only help that I guess her absence could give is having us granted a new trial now. I don't know if that's actually a help or a hindrance. But really and truly, her absence would have only been beneficial had those statements not been allowed to come in. Once those statements were allowed to come in, then her absence was, in fact, a huge hindrance. And we subpoenaed her. What statements of Amber Taylor? Oh, you mean the draft summary that the trial court sort of orchestrated? And her statement. It wasn't orchestrated. It was the trial judge's decision that you could present her testimony via a narrative. No, you're correct the first time, Your Honor. It was orchestrated. The court had this statement drafted. The prosecutor had input. The court had input. It was just confounding error upon error. And we did, in fact, subpoena her. So it's clear that the intent is there all along, that her testimony would have been helpful. And moreover, the jury sent a question to the court while it was deliberating saying, why didn't Amber Taylor appear to testify at trial? It's clear that in addition to Mr. Letson, the jury who decided his fate found her testimony would have been relevant and helpful to making a decision on these charges. Judge Fuentes asked you earlier about the two Mirandais statements. Well, one was Mirandais and the other one was a consent type statement. Yes. What do we make of that? I mean, in terms of harmless error, if you understand my question. So he admitted to these crimes twice in great detail. Yes, Your Honor. And I don't think that those statements standing alone are sufficient to say that, you know, he's guilty beyond a reasonable doubt. Your Honor, we believe, again, that these confessions were, first of all, well, first of all, they were obtained on the basis of Amber Taylor's statements. There was no motion to suppress the statements, right? There was a suppression motion and a suppression hearing. That is not an issue before us. Not specifically, no. But the trial court did deny the motion to suppress. The statements were obtained at the request of Ms. Taylor? The, I'm sorry, Your Honor, the warrant for Mr. Lutzen's arrest was obtained as a result of Ms. Taylor's statements. Prior to that, the police. The confessions were made voluntarily. They were, Your Honor, in order for, in order because my client desired to protect Ms. Taylor. The first statement that he made to the police was made after giving a BVI caution statement, which is not akin to Miranda warnings. Subsequent to that. He went out of his way to approach law enforcement to make a statement and what appeared to be a confession. He did, Your Honor, but that doesn't negate the fact that Ms. Taylor's statements shouldn't have come in. And his confession standing alone is not sufficient to solidify any of the charges against him. He confessed to these crimes. His confessions were inconsistent. His confessions were incomplete. He just said the bare minimum that he could say to take the blame. He stopped talking when he was asked about other issues. He admitted to all the essential elements of the murder and the assault of the young child, right? I wouldn't say that he admitted to all the essential elements. He said what he thought he needed to say. That's far from sufficient for the government to prove its case. If I can interrupt you and ask Judge Van Aske if you have any questions, Judge Van Aske? No, you've covered all the questions I would have had. Thank you. Thank you. Thank you. Thank you, Ms. Boykin. Ms. Salisbury? Good morning. May it please the Court. I'm Kimberly Salisbury, an Assistant Attorney General representing the people of the Virgin Islands in this matter. It's hard to know where to begin. Start with the government removing the witness from the jurisdiction. Yes, Your Honor. The government was led to believe by that witness that she was in danger, her children were in danger, and we assisted a witness in relocating to remove her from that danger. The man she claimed she feared had committed murder, and it seemed like a justifiable reason to assist someone getting out of the territory. There was absolutely no prejudice. The defendant was perfectly capable of subpoenaing or filing a material witness affidavit. Where they determined the wrong impression that they couldn't do that is beyond me. Were they told of the whereabouts of this witness? Yes, they were told she was in Florida. It was never hidden from the defense. What I believe happened, and what seems clear, is that the defense was scrambling prior to trial. Two of the issues presented for review show that the defense was scrambling. They were looking for a motion to continue to get a DNA expert, and they also couldn't find one of the witnesses at the last minute that they wanted to testify. This was not going to be a witness for the prosecution, and that's what's vitally important in this case. But the power and ability to produce the witness was within the government. Isn't that accurate? If the government needed to produce the witness, Your Honor, but the government had no plan to produce this witness to testify. They didn't need this witness to testify. There was an abundance of evidence, including, as you've already mentioned, the two confessions from the defendant. Was there any discussion before the trial judge from the defendant about the need to have Ms. Taylor produced? Yes, there was. And the assistant attorney general informed both the judge and defense counsel that they could easily subpoena the witness in Florida or issue a material. I must be mistaken. I thought the trial judge said, we have no subpoena power over this witness. She was under that mistaken impression. I don't know where that came from, Your Honor, but she was also under the impression. She said that. Once the judge says, we have no subpoena power, we cannot produce this witness. What's a defendant supposed to do? Well, it's incumbent on the government to correct a mistake like that by the judge. And, Your Honor, he did. There is evidence in the appendix that is cited in my brief where he specifically told the judge that we've done this in other cases and you can issue a material witness affidavit. That's all in the record. The government informed both the defense counsel and the trial judge that this person could be subpoenaed and could appear to testify. For some reason, they didn't believe him or they chose not to do so. There is also evidence that the judge did not believe that this testimony was going to help the defendant. She thought that it proved motive for the defendant and said it was not favorable. That's also all in the record. Is that for the trial judge to decide? No, Your Honor. It seems to go right to the heart of the defense that the homicide was committed in order to protect Ms. Taylor, whether true or not. That's why he confessed to protect her. That was at the very heart of the defense, so that witness was about as crucial a witness as the defense could have. I must be misunderstanding, Your Honor, because in my mind and I believe in the trial judge's mind, this was going to prove, just be another point of clarification as to why he committed all of these crimes as opposed to exonerating him in any way whatsoever. It would have shown... His defense in part was that he didn't commit the offenses. He went and actually made a confession because he wanted to protect her. I say whether true or not, that was part of the defense's defense. Or not, being the vital piece of information there, Your Honor. As the district court... As a matter of fact, didn't the jury come out and say, what about Ms. Taylor? Where is she? They did ask that question, and that was a logical question since they had been read all of her testimony prior to deliberation, which was something that the defense... Let's talk about that. Yes. What do you make of the judge, and I think the opposing counsel used the term orchestrating, and what do you make of that whole protocol? Is it troubling? Yes. It is troubling that neither the defense counsel nor the trial judge saw fit to subpoena this witness. It is also troubling that the defense counsel didn't object to the reading of the testimony if they now find it so troubling. That, I believe, is invited error. They didn't object at the time. They drafted it, and they submitted it. I thought what was troubling, I got the impression from the question, is that the trial judge got involved in the drafting of what was to be read to the jury. Well, Your Honor, I believe they were redacting certain information. They actually made corrections of what was to be presented to the jury. So that it wouldn't be objectionable. But it was objectionable from the start. If they, well, as they are now claiming that it hurt their case. At the time, they thought it was going to help their case, and that's why it's invited error, Your Honor, and shouldn't be on appeal in the first place. Moving on. One of the other issues they brought up for appeal. One other thing, because I just remember reading that the trial judge had made a comment about Ms. Taylor. Something to the effect of, I think she's involved in this. Does that sound familiar to you? No, Your Honor. She's involved in this? Yes. She may have been referring to the theft that occurred prior to the murder? In this whole thing. I don't recall seeing that, Your Honor.  That was a very negative comment about Ms. Taylor. Well, like I said, Your Honor, the trial judge did not seem to believe that her testimony would help the defense. And there was an abundance of evidence that helped to help the jury find Mr. Lettsam guilty. In addition to his confessions, there was physical evidence, DNA evidence that was presented to the jury. So his confessions were corroborated, as would be necessary. But I don't recall those comments, Your Honor. I'm sorry. So you agree that the judge erred with respect to the protocol with which Ms. Taylor's evidence was presented to the jury? Yes, I do. But I believe that error is harmless. And that the harmless error standard does apply in this case because this is not a structural defect. The U.S. Supreme Court has never declared it to be a structural defect. Did the prosecutor have information as to the precise location of Ms. Taylor in Florida? Not the precise location, unfortunately. I believe the evidence shows that the government assisted her in purchasing a plane ticket to Florida for herself and her children, but they did not know exactly where she was living after she arrived. But they did, there was evidence in the record that they did help her relocate to Florida. Could you, this may be something you may not have an answer to, but I was a little concerned about the fact that the Appellate Division, which reviewed the conviction in this case, took seven years to issue it. I was wondering, what if we were to reverse this case and there'd be a trial? It would mean that Mr. Lettsam would have to spend seven years in jail on a case that might very well be reversed. How did that happen? Is this usual that it takes seven years for an appellate court to issue an opinion? Unfortunately, Your Honor, I don't know why it was so long. I have the opinion right in front of me, and it said it was considered in 2010, and then the opinion was filed in 2015. So I think it was five years, not that that is... It was considered in 2010, but it was fully briefed two years before. It was ready to be decided. That's entirely possible, Your Honor. No, I don't know the answer to that. Okay. I think we've covered, through much of the discussion, the fact that there was sufficient evidence to convict. What about the counsel's argument that they were prejudiced by the judge not granting a continuance to allow their expert to verify or contradict or challenge your DNA evidence? Again, Your Honor, I believe that they were aware that the DNA analysis was being done, and as you all may be aware, it is very difficult in the Virgin Islands to get these kinds of analysis done. It's all sent off island, and we are at the mercy of the labs in Florida. And so it is no one's fault how long it takes for it to come back. But the defense was well aware from March, and the trial wasn't until August, that this was going to be an issue. They had plenty of time to procure an expert of their own, who then would have had, yes, two weeks, but time, because he would have known it was coming, to review the analysis, and then they wouldn't have needed a continuance. And obviously that's what the judge felt as well, that this continuance was not necessary and was through no fault of anyone but themselves. What about the amendment of the charging documents? Counsel didn't talk about it, but I know it's an issue in this case. It is one of the issues that was raised, but I believe it's meritless, Your Honor. The information is allowed under the Criminal Procedure Rule 7E to be amended prior to the verdict. They were on notice as to all the charges. All the charges that were listed there, they were all in bold. It was a minor, it was nothing additional, it was just a minor amendment, and they weren't prejudiced in any way whatsoever. So despite the fact that everyone seemed to believe, the judge and the attorneys, that Ms. Taylor could not be subpoenaed, that turned out to be incorrect. Yes, Your Honor. And like I said, the prosecutor didn't believe that he couldn't or she couldn't be subpoenaed, and he did try to make the defense counsel and the judge aware of that. And like I said, I cited to the appendix where Your Honors can read that he specifically said she can be subpoenaed, that we've done this in other cases, Your Honor. Do you have that page number for me? I do. The people made an effort to inform the defense and the judge during appendix volume 3, page 667, that she now lived in Florida and that she could be subpoenaed. Yes, and I think it's 669-670, Attorney Basin identifies prior instances where they've brought in witnesses from Florida. Again, counsel didn't touch on it, but she mentioned it. What's the government's position with the sentence? As you would imagine, Your Honor, we do not believe the sentence was excessive. We certainly don't believe that there was anything to remand. All of the sentences were within the statutory minimums, and some of them were even merged together. The gravity of the offense here certainly equals the severity of the sentences. We don't believe there was anything to reverse on that matter. If there's nothing further, okay. Thank you very much. Thank you. Ms. Boykin. Good morning again. I believe it is your question, Judge Fuentes, where you said that the trial court may have said she's involved in this. The trial court did, in fact, say that. I believe it was before the jury. What she said is that she is a central figure in this case. Yes. At that point, the trial court was admonishing a prosecutor, inquiring as to why charges had not been filed against Ms. Taylor. That wasn't something that was done at the trial or in the hearing of the jury. And another issue the government asserts is that Ms. Taylor was in Florida, so we could have subpoenaed her. We can't issue a subpoena in the state of Florida. We need to know where Ms. Taylor is. Florida is a pretty big state. I'm sure there are counties there that have greater populations than the entire Virgin Islands. Once the government sent her there and didn't bother to keep track of her location or had her location and didn't reveal it to the defendant, that made it impossible for us to subpoena her. Next, it was clearly improper for the trial judge to allow the amendment of the information on the morning of jury selection. What was the prejudice as a result of that? The prejudice was the fact that Mr. Letson didn't have sufficient time to prepare to defend those charges. New charges were added in the trial court's judgment and commitment. She specifically states that without the essential elements, no crime is alleged. Rule 7 only permits amendment if no new crime is alleged. The trial court's ruling is inconsistent with the Federal Rules of Criminal Procedure that is stated in its own judgment and commitment. Second was the issue with the sufficiency of the evidence, Your Honors, for count 11. Again, there was no finding that arson being committed at nighttime means... It was 4 in the morning, right? Correct. There's... Yes. There's no evidence. There was nothing to suggest that 4 a.m. is the nighttime. The only cases in this jurisdiction that have dealt with that dealt with cases before midnight, and there was no evidence presented that this arson occurred before midnight. In fact, all the evidence showed that it was committed around 4 a.m. Boykin, thank you very much. Thank you. Thank you both for well-argued cases. Thank you. We'll take the matter under advisement.